**FILED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

JUN 2 4 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

824 Whispering Winds Lane
Chico, California 95928

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number:

2:08 - SW - 0248  KJM

I, Kathleen A. Nicolls being duly sworn depose and say:

I am a(n) Special Agent, Federal Bureau of Investigation and have reason to believe that
□ on the person of or ☒ on the property or premises know as (name, description and/or location)

**824 Whispering Winds Lane, Chico, California, which is more particularly described in Attachment A hereto, which is
incorporated by reference as if set forth in full,**
in the _____ EASTERN _____ District of _____ CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment B hereto, which is incorporated by reference as if set forth in full**

which is (state one or more bases for search set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
**evidence, fruits, and instrumentalities**

concerning a violation of Title **18** United States Code, Section (s) **1341, 1343, 1344, 1349, 1014, 1957** and Title **21**, United States
Code, Sections **841(a)(1) and 846**.
The facts to support a finding of probable cause are as follows: **See attached Affidavit of Special Agent Kathleen A. Nicholls**
Continued on the attached sheet and made a part hereof:    ☒ Yes    □ No

*Kathleen A. Nicolls*
Signature of Affiant
Kathleen A. Nicolls
Special Agent, FBI

Sworn to before me and subscribed in my presence,
June 23, 2008
Date                                                              at Sacramento, California
                                                                        City                                          State

Kimberly J. Mueller, United States Magistrate Judge
Name of Judge                    Title of Judge                    Signature of Judge

# SEALED

## **AFFIDAVIT**

## **AFFIDAVIT OF KATHLEEN A. NICOLLS IN SUPPORT OF SEARCH WARRANT**

### I. BACKGROUND AND EXPERIENCE OF AGENT

I, Kathleen A. Nicolls, having been duly sworn, do hereby state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI), presently assigned to the Sacramento office. I have been employed as a Special Agent since September 2006. During that time, I have received training and have experience in the investigation of fraud and other financial crimes. As part of my duties and responsibilities, I investigate loan and credit fraud, mail fraud, wire fraud, bank fraud, and money laundering under 18 U.S.C. §§ 1014, 1028(a), 1341, 1343, 1344, 1956 and 1957. I have learned the facts of this investigation from Special Agent Mark H. Roberts of the FBI ("SA Roberts"), who is assigned to the Sacramento Division. I understand that Special Agent Roberts has been employed as an agent with the FBI for approximately eleven years.

2.  Like me, SA Roberts also investigates violations of the laws of the United States of America, including wire fraud, mail fraud, bank fraud, money laundering, and other financial crimes. He has participated in over 100 criminal investigations. SA Roberts and Investigative Lieutenant Bruce Wristen (hereafter Lt. Wristen), Butte County District Attorney's Office (BCDAO or "Butte County") have investigated this case together. Not every fact known as a result of this investigation has been not included; rather, only facts necessary to establish probable cause have been. The facts stated herein reflect information that Special Agent Roberts has provided to me.

### II. PREMISES TO BE SEARCHED

3.  This affidavit is made in support of a warrant to search the following locations:

A residence, all outbuildings and vehicles located at 824 Whispering Winds Lane, Chico, California, which is more particularly described in Attachment "A."

## III. STATUTORY VIOLATIONS

4.      Based on information set forth in this affidavit I have probable cause to believe that Garret Griffith Gililland III (age 26, of Chico, California), his common-law wife, Nicole Magpusao (age 28, of Chico, California), real estate developer Anthony Garth Symmes (age 57, of Paradise, California), Baker & Baker Construction, and others, have operated a mortgage fraud scheme in violation of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Bank and Wire Fraud), and 1014 (False Statements of a Loan Application).  Further, I believe that Gililland has also conspired to manufacture 100 or more marijuana plants, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  I also have probable cause to believe that Gililland, Magpusao, Symmes, and Baker & Baker Construction, have conducted financial transactions with the proceeds of unlawful activity in violation of Title 18, United States Code, Sections 1957 (Money Laundering).

5.      Through his personal review of documents as well as interviews of victims and other individuals, SA Roberts has become familiar with the facts and circumstances of this investigation.  The information set forth in this affidavit reflects his personal knowledge or has been provided to him by other law enforcement officers, sources, victims and other interested parties.  He has also received information through his review of various database searches.  As this affidavit is being submitted for the limited purpose of securing authorization to execute a search warrant at a specific location, not every fact known to SA Roberts concerning this investigation has been included.  Rather, only facts relevant to establishing probable cause to obtain authorization to conduct the search have been included.

## IV. PROBABLE CAUSE

### A.      Source Information and Start of Investigation

6.      The FBI investigation of Gililland began in early December 2007, when a Confidential Human Source (Source) obtained information that Gililland was committing mortgage fraud by recruiting straw buyers to purchase new homes from a Chico builder at

inflated prices. The Source was able to identity a former Gililland employee whom SA Roberts then interviewed (hereafter "Employee #1").

7.      Employee #1 worked for Gililland for over six months in 2007. Gililland had opened an unlicensed branch office of Creative Funding Consultants, a La Mesa, California mortgage brokerage. Employee #1 saw checks up to $20,000 that Gililland cashed from real estate commissions.[1] Employee #1 did not understand what the payments were for. Employee #1 related that Gililland set up several corporations such as G III Construction, Inc., GIG Enterprises, Inc. and Norcal Innovative Investments, Inc., as front companies. Employee #1 related that Gililland works closely with Anthony G. Symmes, a large scale developer in Chico. Gililland has brokered mortgages mainly for Symmes' newly-constructed houses. Employee #1 stated that Gililland had also done a few fraudulent mortgages for another builder in Chico.

8.      Employee #1 explained that Gililland's scheme worked by recruiting straw buyers and falsifying their loan applications. He would have clients claim that they earned more money than they really did. Gililland used a range of contacts and associates to falsely verify employment when lenders called to verify a loan applicant's employment history.

9.      Employee #1 worked closely with Gililland and came to understand his personal expenditures. Employee #1 stated that Gililland spends about $30,000 per month to fund his lavish lifestyle. His home mortgage payment is about $5,000 per month. He pays $1,000 per month for his BMW sedan, and $1,000 each for his two Mercedes sedans. According to Employee #1, Gililland frequently travels to Los Angeles and Las Vegas for entertainment. In 2007, Gililland bought two properties in the name of his common-law wife, Nicole Magpusao. Additionally, Employee #1 also has seen Gililland inject himself with illegal steroids. At the close of the interview, when asked if as high as 40-50% of Gililland's loans may be fraudulent, Employee #1 replied that 100% of them were.

10.      According to Employee #1, in May 2007, Gililland moved out of the offices he shared with a real estate brokerage company called "JP Monaco Associates," and took his operation into his home-office at 824 Whispering Winds Lane in Chico. Employee #1 detailed that Gililland's home computer has loan software called "Point System." On that computer he also had electronic copies of appraisals, e-mail correspondence with straw-buyers and with the

---

[1]Gililland does not hold any type of real estate license or mortgage broker license.

mortgage industry professionals with whom he works. Employee #1 stated that Gililland keeps work documents at his home at 824 Whispering Winds Lane in Chico.

11.     On December 11, 2007, Butte County opened an unrelated fraud case involving local real estate broker Justin Monaco. Monaco was living at and working out of a home at 2851 Vistamont Way, in Chico. The Butte County Assessor's database listed a man named Hugh Arca as the owner of this home.

12.     Lt. Wristen then reviewed files at the Butte County Clerk/Recorder's office regarding Arca. The database showed Arca had actually purchased three homes in a ten day period in July and August, 2006 – all from the same developer, Anthony G. Symmes. Based on the transfer tax listed on the grant deeds, it appeared Arca had purchased roughly $1,000,000 worth of homes over that short period. Each deed of trust listed a different mortgage company. Arca was discharged in mid-2006 from the U.S. Air Force. The loan applications for Arca contain bogus and mutually-exclusive employment and wage histories.

13.     Also in December 2007, the Special Enforcement Unit of the Butte County District Attorney's Office had come across its own information on this mortgage fraud scheme as a result of an investigation into a marijuana manufacturing and distribution ring. In December 2007, the Special Enforcement Unit had executed court-authorized search warrants of properties belonging to Jake Halvig and his brother in-law, Christopher Chiavola, as part of a larger investigation of an indoor marijuana cultivation scheme.[2] Following the arrest of Halvig and the search of Chiavola's home, the Special Enforcement Unit received information from a cooperator that Halvig, Chiavola, and another person named Gililland were buying homes using straw-buyers and setting up indoor marijuana grows in some of them. It was also learned that Chiavola was working for a mortgage company in Chico, and that Gililland was working for a mortgage firm from outside the area. Gililland worked out of an office at 3100 Cohasset Road, Chico, California. This was the same address as the real estate offices of "JP Monaco & Associates," owned by Justin Monaco.

14.     On December 16, 2007, Lt. Wristen interviewed a former employee (hereafter "Employee #2") of Monaco & Associates in Chico, California. Employee #2 confirmed that Garret Gililland had also worked out of the office on Cohasset Road and that Gililland had a

---

[2] Subsequent investigation has shown that Halvig and Chiavola are also straw-buyers in Gililland's scheme.

separate office inside the building.   Employee #2 said that Gililland worked for a mortgage company based in Southern California.   Employee #2 related an incident at the community copy machine where one of Gililland's employees asked Employee #2 to look at a fabricated PG&E bill to see if it looked authentic enough to fool the mortgage company.

15.      In January 2008, FBI and Butte County became aware that they were both working the same case, and decided to work it together.   On February 26, 2008, SA Roberts and Lt. Wristen interviewed another former Gililland employee (hereafter "Employee #3"). Employee #3 worked for Gililland for several months in 2007.   Employee #3 reported that Gililland and his loan consultants would falsify credit and work histories for the clients. According to Employee #3, Gililland is the mastermind of the scam, but a man named Shane Burreson, who is an associate of Gililland's, is also important in the execution of the scheme. Subsequent investigation has shown that Burreson incorporated Norcal Innovative Investments, Inc., one of the front companies Gililland uses to execute the fraud.

16.      Employee #3 also heard Gililland tell a loan processor, "Sure, we'll take care of that.   We'll fab that up."   Employee #3 understood Gililland to use the words "fab that up" to mean that he would supply false financial information to make a client qualify for the loan. According to Employee #3, Gililland was probably working twenty or twenty-five houses in this way during that peak time in 2007.

17.      According to Employee #3, Gililland negotiated to sell numerous houses for Anthony G. Symmes in this fashion.   According to Employee #3, Symmes and Gililland conspired in face to-face meetings to sell homes to straw buyers.   Symmes would reserve a certain number of homes for Gililland to sell for him, and the remainder would be marketed by reputable real estate agents. (SA Roberts has subsequently learned from a legitimate realtor who works with Symmes that Symmes had insisted on a clause saying that he could pull the listing from the realtor at any time and sell it on his own.   In fact, in 2007, in a slow market, Symmes pulled one listing from this realtor for a house listed at $329,000.   A few weeks later, the realtor learned the house had been sold for $56,000 over asking price, at $385,000.   SA Roberts' investigation has since revealed this to be another Gililland straw-buyer sale.   This house recently went into foreclosure.)   Employee #3 concluded that Symmes was careful to make sure his agreement with Gililland was an oral understanding so that little would connect him to Gililland on paper.

18.    Two days after the interview of Employee #3, on February 28, 2008, SA Roberts and Lt. Wristen interviewed Justin Monaco, the owner of JP Monaco & Associates. Butte County District Attorney's Office investigators had recently confronted Monaco regarding his own legal problems. Monaco had written several bad checks and was the target of a separate land fraud investigation. Monaco had mentioned to Butte County investigators that he possessed valuable information concerning a large mortgage fraud scheme that he wanted to trade for leniency in his own case. After the interview of Employee #3, Monaco's role in the Gililland case became of interest.

19.    Monaco claimed that his relationship with Gililland started in late 2005. Monaco had a real estate office on Cohasset Road in Chico, California named "JP Monaco and Associates." According to Monaco, Gililland answered Monaco's advertisement for a mortgage broker to rent a space in his building. Shortly after Gililland moved in, it was clear that he was not doing things by-the-book. For example, Monaco became aware that Gililland was using phony documents and was qualifying buyers who should not normally be able to obtain loans. Monaco claims he eventually figured out how the scheme worked.

20.    Monaco explained that one of Gililland's employees would bring in a straw-buyer. Gililland would then use that person's name and fabricate a work history. He would rebuild their credit with forged documents, reporting payoffs of credit card debt and past due bills, when, in fact, they had not been paid off. Gililland would then negotiate the purchase of a home from Anthony G. Symmes, bumping the price up with an inflated appraisal. Monaco said that Gililland would possibly give the straw buyer a few thousand dollars for the use of his/her name. According to Monaco, Symmes was well aware of what was going on and would split with Gililland the amount paid over the true cost of the house. On more than one occasion Monaco overheard phone conversations between Gililland and appraiser Marcia Stewart where Gililland would tell her to bring him a higher appraisal on a specific house. After about 8 or 9 months of Gililland in the office, Monaco's staff started complaining about him and his employees. According to Monaco, the final straw was when Monaco caught Gililland asking his receptionist to help with forged documents. According to Monaco, Chris Chiavola, Jake Halvig, Shane Burreson, and Phil Andreas were Gililland's "crew." Monaco also stated that Gililland uses the e-mail account "scarycash@gmail.com" to communicate with people in the mortgage industry.

B.     Overview of Gililland's Mortgage Fraud Scheme

21.     On March 5, 2008, Lt. Wristen and SA Roberts interviewed another former Gililland employee (hereafter "Employee #4") at the U.S. Attorney's Office in Sacramento. Employee #4 provided a detailed overview of Gililland's background and his mortgage fraud scheme:

22.     Until a few years ago, Gililland, 26 years old and a former Chico State student, was a personal trainer and bodybuilder with few assets. Then Gililland began operating as a "mortgage broker assistant." In just a few years, Gililland has managed to purchase a million-dollar home; he controls dozens of other homes through straw buyers; and has acquired customized motorcycles and expensive foreign automobiles. According to Employee #4, Gililland openly models himself after the criminal hero of the 2000 Vin Diesel film, "Boiler Room."

23.     Gililland primarily recruits straw buyers with bad or no credit to purchase new homes from one of Chico's largest home builders, Anthony G. Symmes. Gililland has replicated the scheme with two or three other Chico builders. The straw buyers are told they will receive a kickback (usually between $1,000 and $5,000 for every house they allow Gililland to purchase in their names). Gililland then uses computers to falsify employment records, Forms W-2, Forms 1099, and other financial documents so that the straw buyers will qualify for loans. Gililland uses several front companies to provide false Forms W-2 and 1099 and to provide fraudulent employment verification to lenders for his straw buyers. The front companies are: West Coast Training Systems; G III Construction, Inc.; GIG Enterprises, Inc.; and Norcal Innovative Investments, Inc.

24.     The home prices are inflated by means of overstated appraisals and other credits. Sometimes the builders cover up these kickbacks by providing false invoices to Gililland's company, G III Construction, Inc., and other front companies he controls. These kickbacks are for $20,000 to $30,000 in "home improvements" that are never actually made.[3] Sometimes the

---

3SA Roberts' investigation has shown that homes Gililland sells for Symmes consistently sell for a minimum of $30,000 to $50,000 (and some up to $100,000) over comparable prices of neighboring new homes sold by Symmes to bona fide purchasers.

kickbacks are styled simply credits or fees paid directly out of escrow. From these fraud proceeds, Gililland pays the straw buyers their share.[4]

25.     Gililland then rents out the houses he controls. He uses "enforcers" to collect rent payments. Gililland initially makes sure the mortgage payments are current. But within six months or so, he stops paying the mortgages, yet still collects the rent money. The majority of the homes then fall into foreclosure within twelve months of purchase. Gililland walks away without any connection to his own credit record. The straw buyers, who have little credit history, are paid enough to make it worth their while to take the foreclosure on their credit histories.

26.     Employee #4 explained the role in the scheme of a loan processor that Gililland used at a company called "Streamline Transactions, Inc." That woman, Michelle Stanovich ("Michelle"), is married to Chad Stanovich, who is an employee at Creative Funding Consultants, Inc., in La Mesa, California. (The "parent" company for which Gililland works out of his unlicensed Chico office). Michelle's job at Streamline is to make sure loan packages contain what they need for forwarding to the lender. Employee #4 stated that Gililland told Michelle that for every brokered file she could do for him, he would pay her "a fee." That fee would be in addition to the money that escrow already pays Streamline Transactions for its role in getting loans funded. According to Employee #4, Michelle knew full well that the loan applications were fraudulent. On one occasion, Michelle was aware of a fraudulent invoice from "Valley Crest Advertising" that Gililland had created. That invoice purported to show $20,500 in cosmetic repairs to a property at 1419 Yosemite Drive in Chico, California. Michelle noted that it made no sense for home repairs to be performed by an advertising company. Ultimately, this invoice was altered to read simply "Valley Crest." The $20,500 was successfully added onto the sale price, inflating the true price of the house. In effect, the seller fraudulently inflated the price of the house and then kicked back a portion of that amount to Gililland by virtue of this false invoice for which no real work had been performed. All parties to the sale were well aware of this fraud. Employee #4 also reported that Gililland used a Gmail e-mail address to communicate with Michelle on this deal and others.

---

4To date, the kickbacks from companies controlled by Anthony G. Symmes alone amount to over $600,000. To date, kickbacks identified from Baker & Baker Construction, controlled by William Baker, amount to approximately $100,000.

C.    Analysis of Fraudulent Loan Documents and Bank Records

27.    At this point in the investigation (March 2008), SA Roberts was able to identify specific straw-buyers in addition to Hugh Arca. Dozens of subpoenas have been served and, to date, SA Roberts has received, over the last several months, roughly twenty-six loan files from various lenders. SA Roberts has also received many bank records of the targets of the investigation. As of today, approximately twenty more subpoenas are being prepared, and more are expected. Numerous mortgage loans involving Gililland's sales of Symmes's homes contain false information on the loan application followed by financial kickbacks from Symmes to Gililland at close of escrow.   Suspected straw-buyers identified to-date include:

> Phillip Andreas; Roman Aquino; Hugh Arca;  Earl Armor; Erica Arnett; Kelly Blake; Christopher Brown; Christopher Chiavola; Katie Chiavola; Eric Clawson; Juana Contreras; Michael Frank Dematteis, II; Maria Devilla; Christopher Faulkner; Crystal Fortune; Edward Fortune, Jr.;  Alfaro Alberto Garcia;  James M. Goularte; Thaddeus Brandon Greene; Jake Halvig; Enoch Hernandez;  Lucia Hernandez; Loren C. Jacques; James Lambert; Samuel Marquez; Pedro Pinto; Brandon Resendez; James Saraniecki;  Allan Lawrence Sarti; Sharrah Rueanna Trust; and Aaron Sherwood.

What follows is a brief summary of a few selected transactions:

###    (i)    2738 Ceanothus Ave, Chico, California

28.    SA Roberts obtained complete loan documentation for the sale of 2738 Ceanothus Avenue in Chico. On or about January 10, 2007, straw buyer Christopher Faulkner purchased this house for the inflated price of $465,000 from "Ceanothus Traditions, Inc.," a company that builder Anthony G. Symmes controls.  Garett Gililland used an employee named "Danielle" at Cosmo Loans Financial (supposedly in Tustin, California, but who was actually working in Chico for Gililland) to arrange the loan with lender Fieldstone Mortgage, headquartered in Columbia, Maryland.  The house was 100% financed. The "non-recurring closing costs" were very high at $22,793.71. Two days after close of escrow, on January 12, 2007, Anthony Symmes's corporation Mariposa Traditions, Inc. drafted check #2607 to Norcal Innovative Investments, Inc. for $17,000.00. Shane Burreson negotiated and deposited the check into the

bank account of Norcal Innovative Investments, Inc. Gililland has co-signature authority on Norcal Innovative Investments, Inc.'s bank account.

29.     Faulkner's wage and employment history supplied to the lender is fraudulent. The lender's "Employment Verification" form appears to have been completed by telephone. "Kevin Sharrah Designs" apparently verified that Faulkner was a full-time employee who managed the shop. In his loan application, Faulkner claimed that he made $14,500 per month ($174,000 per year) working for Kevin Sharrah Designs.[5]  Lt. Wristen had an officer check the premises of Kevin Sharrah Designs. It is a very small business in Chico that does vinyl design and custom helmet painting for motorcycle enthusiasts (like Gililland) – a business unlikely to pay $174,000 per year to a high school graduate who is an alleged "officer manager." Lt. Wristen then checked Faulkner's name and Social Security Number (SSN) with California's Employment Development Department (EDD), the entity charged with collecting state employee withholding taxes. EDD states that it has no record of Faulkner being employed by the company Kevin Sharrah Designs. The lender foreclosed on Faulkner's property in January of 2008. Fieldstone Mortgage has itself gone into bankruptcy.

### (ii)     83 Pauletah Place, Chico, California

30.     Garret Gililland has even used his common-law wife, Nicole Magpusao, as a straw purchaser on two newly-built homes in Chico. On June 24, 2007, Magpusao applied to Novelle Financial Services in Laguna Hills, California, for a loan amount of $376,200. This loan was for the purchase of 83 Pauletah Place in Chico, California, from Baker & Baker Construction, for the sale price of $396,000. On her uniform residential loan application, Magpusao claimed that she would occupy 83 Pauletah Place as the owner. A reliable source states that Magpusao, in fact, has resided with Garret Gililland, at 824 Whispering Winds Lane in Chico since April 2007. Magpusao is believed to be a stay-at-home mother of Gililland's small child and believed not to work outside the home. Nevertheless, on her loan application, Magpusao claimed to have made $8,750 per month (or $105,000 per year) as an "office manager" at Savings Direct Magazine for the previous three years.

31.     Savings Direct magazine is a small business in Chico that puts out coupons for retail purchases. One of Gililland's other straw buyers, Loren C. Jacques, "owns" Savings Direct magazine. Novelle Financial Services's "employment verification worksheet" lists the

_____

[5]One of the suspected straw buyers is an entity called "Sharrah Rueanna Trust."

phone number for Lauren Jacques, who verified Magpusao's employment. This phone number has recently been identified as the same number for Garret Gililland's cellular telephone. Likewise, the address of Savings Direct magazine is the same address listed for Chris Chiavola, another Gililland straw buyer and a principal of Creative Funding Consultants, the unlicensed Chico branch of Creative Funding Consultants that is located in La Mesa, California. Sources have described Savings Direct magazine as a one-to-two person operation with no offices. Lt. Wristen checked Magpusao's name and Social Security Number (SSN) with California's Employment Development Department (EDD). EDD states that it has no record of Magpusao being employed by Savings Direct.

32.     Novelle Financial Services also created a document entitled "bank statement income." That document shows the total bank deposits that Magpusao claimed to have made to her Wells Fargo Bank Account for June 2006 through May 2007. The lender's summary showed that Magpusao made a total of $200,371.22 in deposits for this period.

33.     This transaction was brokered by 3rd Sky Mortgage. At close of escrow of Magpusao's purchase of 83 Pauletah Place in Chico, 3rd Sky Mortgage caused a payment of $26,000 to be made to Norcal Innovative Investments, another Gililland-controlled company. Bank records show that Garret Gililland endorsed and negotiated the $26,000 check.

### (iii)     3291 Rockin M Drive, Chico, California

34.     During the same month that she purchased the house at 83 Pauletah Place in Chico, Magpusao was also purchasing a house at 3291 Rockin M Drive in Chico from "Rockin M, Inc.," an Anthony G. Symmes company. Magpusao also claimed she would occupy that house as the owner. On the uniform residential loan application that she provided to Fieldstone Mortgage, Magpusao now claimed that she was employed as a "sales representative" with Savings Direct magazine, earning $17,107 per month. Magpusao gave Fieldstone Mortgage similar employment contact information that she had given Novelle Financial Services.

35.     Fieldstone Mortgage prepared a document entitled "bank statement analysis." This document summarized average net deposits Magpusao claimed to make into her Wells Fargo account from May 2005 through April 2007. The lender's summary showed that Magpusao made average monthly deposits of $17,107 per month for this period (or $205,284 for one year).

36.     On June 18, 2007, Fieldstone Mortgage fully funded both Magpusao's first and second mortgages in an 80/20 (100% financing) loan package for 3291 Rockin M Drive. The total purchase price of $410,000 was paid to Rockin M, Inc., minus a "credit to buyer" of $17,296 at escrow for "closing costs."   Additionally, on June 20, 2007, Mariposa Traditions, Inc., another Symmes company, sent check #2977 for $10,000 to GIG Enterprises, Inc.  Gililland and Magpusao have co-signature authority on GIG Enterprises, Inc.'s bank accounts.

### (iv)     2689 Ceanothus Avenue, Chico, California and
### 824 Whispering Winds Lane, Chico, California

37.     In April 2007, two months before Gililland's common-law wife purchased the two above-described houses, Gililland himself bought a rental house at 2689 Ceanothus Avenue in Chico for $325,000.  Gililland purchased this house from Jake Halvig, an associate of his, who, in turn, (according to public records) had purchased it six months earlier, on October 18, 2006, from Anthony Symmes's company, Ceanothus Traditions, Inc., for approximately half the April 2007 price. The October 2006 sale from Ceanothus Traditions, Inc. to Halvig was funded by mortgage lender Agasy, Inc., a company Anthony G. Symmes owns and controls.   California Secretary of State records show that Agasy, Inc.'s business address is 1850 June Way, Paradise, California. That address is also the home address of Anthony G. Symmes. Indeed, a vanity plate on one of Symmes' many automobiles reads "Agasy." Needless to say, the outstanding loan to Symmes company would have been paid off when Gililland bought the house from Halvig.[6]

38.     On Gililland's loan application to National City Bank for his April 2007 purchase of 2689 Ceanothus Avenue for $325,000,  he claimed he had been earning $35,000 per month (or $420,000 per year) as employment income from "G III Construction, Inc." for the past 3 years, 9 months. But in another loan application made to Greenpoint Mortgage, several months earlier to refinance his primary residence at 824 Whispering Winds Lane, Gililland claimed that G III Construction, Inc. had only been in existence for a couple of months – not the 3 years 9 months he claimed to National City Bank. Indeed, the California Secretary of State's records indicate that "G III Construction, Inc." was created by Garret Gililland III on November 15,

---

6SA Roberts has not subpoenaed "Agasy, Inc." for the mortgage file because Symmes would be tipped off and could destroy evidence. Agasy documents will be sought via search warrant and/or subpoenas on other entities at the appropriate time.

2006. Nevertheless, National City Bank funded Gililland's loans on the purchase of the rental property at 2689 Ceanothus in Chico.

39.     On the income portion of the loan application for the refinancing of his primary residence, Gililland claimed he worked for both "West Coast Training Systems" as a personal trainer and for "Creative Funding Consultants" as a "mortgage broker assistant." He did not mention GIII Construction in this initial application. Gililland claimed total income of $45,000 per month ($540,000 annual income).

40.     Upon questioning from the lender, in February 2007, Gililland supplied a signed letter "clarifying" that his income was actually derived from his activities as "a real estate consultant" with "Creative Real Estate Consultants," apparently an offshoot of "Creative Funding Consultants." The letter claimed that West Coast Training only had three clients and that he made essentially no money from it. Gililland claimed in the letter that he derived his $45,000 per month income from "Creative Real Estate Consultants." The letter explained that with the recent downturn in the real estate business he had moved on from "Creative Real Estate Consultants" and had just started a construction company called "G III Construction, Inc." Faced with this explanation and a 26 year-old in Chico, California, who was claiming $45,000 in monthly income, Greenpoint Mortgage ultimately rejected the loan application.

D.     The Mortgage Fraud – Marijuana Cultivation Connection

        (i)     **1585 Arch Way, Chico, California**

41.     The intersection of Gililland's mortgage fraud and marijuana cultivation schemes is located at 1585 Arch Way, Chico, California. SA Roberts obtained complete loan documentation from lender Fieldstone Mortgage for this sale. On or about July 7, 2007, straw buyer James Lambert purchased 1585 Arch Way for $385,000 from "Floral Arrangement, Inc.," another Anthony G. Symmes company. Numerous material falsehoods appear in the loan papers.

42.     On Lambert's first Uniform Residential Loan Application, for 80% of the financing, made on or about June 28, 2007, Lambert claimed that the above property would be owner-occupied. In fact, according to sources, Lambert never occupied the house. On his June 28 application for 80% of the financing, Lambert claimed his employer was "AGS Construction Services," located at 262 Tranquil Drive, Paradise, California, earning $7,677.83

Affidavit of Special Agent Kathleen A. Nicolls     13

($92,133 per year) monthly from AGS Construction Services.[7] A query with California EDD for Lambert's Social Security Number shows that he did not work at AGS Construction Services, but rather at a motorcycle salvage company. Finally, on his loan application of June 28, 2007, Lambert also claimed that his present address was 1022 Pleasant Lane, Paradise, California. Choicepoint shows that Gililland purchased 1022 Pleasant Lane, in Paradise on March 26, 2007 from builder Larry Biegler. Sources report that Biegler is Gililland's mentor.

43.     A law enforcement officer who frequents the Arch Way area reported an interaction he had with the first renters of 1585 Arch Way. The renters complained to the officer that they had been harassed by "the owner, Garret Gililland." A renter related that Gililland had his enforcer, a martial arts fighter and suspected straw buyer named Eric Clawson, punch his roommate in the face because the roommate was late with a rent payment. So fearful these renters became of Gililland and Clawson that they moved out suddenly.

44.     The same law enforcement officer was surprised to learn that the alleged legal owner of 1585 Arch Way was James C. Lambert. The officer himself has arrested Lambert in the past and knows him on sight. The officer, who is often in the area, has never seen Lambert at 1585 Arch Way. But the officer has confronted a man named Gilbert Dowd at 1585 Arch Way. One night, Dowd was climbing through a window of 1585 Arch Way. The officer confronted Dowd, who told him that he worked for "the owner, Garret Gililland." The officer also has seen Gililland arrive at the property on an expensive customized, stretch Harley Davidson motorcycle.

45.     As noted above, Lambert never put down roots at 1585 Arch Way. Rather, about 100 marijuana plants did.

46.     At some point in May or June 2008, the lender began the foreclosure process on 1585 Arch Way after Lambert fell far behind in mortgage payments. On June 12, 2008, Lt. Wristen interviewed a realtor working for the lender's reconveyance company. That realtor said the second set of Gililland's tenants were told that they must leave the property, which they did. The realtor told SA Roberts and Lt. Wristen that when the tenants moved out of 1585 Arch Way, she inspected the house and found abandoned property there. The property included marijuana

---

[7]On a separate unsigned loan application also included in the lender's file, Lambert claimed that his monthly income was $14,500 ($174,000 annual income) from the same employer.

bongs, glass pipes, small marijuana plants, and even a shotgun, some of which she turned over to the Chico Police Department. She explained that more items remained in the house.

47.     On June 14, 2008, Lt. Wristen and SA Roberts inspected the abandoned house and collected numerous items that evidence an indoor marijuana grow. Those items include: mylar plastic coating for the windows; grow lamps; many marijuana seedlings; altered duct work; fertilizer; potting soil; electric bills for several months showing charges of approximately $1,000 per month in the Spring of 2008, which is consistent with an indoor grow operation; numerous planters; spare flourescent bulbs; and even a how-to book on gardening for small commercial growers. Finally, a hand made cardboard sign was found in a garbage bag in the garage of the house that read, "Keep the bathroom fan on... it will help... Fr Gil," which SA Roberts interprets as keeping the fan on will help circulate the air to disperse the strong marijuana odor from the growing plants, signed Gililland. A Butte County Special Enforcement Unit narcotics officer also inspected the house. Based on his training and experience, he verified that it had clearly been an indoor marijuana grow.

              (ii)     **2733 Ceanothus Avenue, Chico, Calfornia**

48.     The real estate agent also later informed SA Roberts that she knew of another suspected marijuana grow house. This house, at 2733 Ceanothus Avenue, had been sold by Ceanothus Traditions, Inc., a Symmes's company, to Roman Aquino, another Gililland straw-buyer. Upon foreclosure, the realty company had to hire a handyman to fix the alterations to the duct work and the holes in the ceiling that also evidenced a marijuana grow. Choicepoint shows that the property was foreclosed in April, 2007.


       F.     Use of the Interstate Wires and Mails

49.     Review of the loan and bank records reveals a number of interstate wire transfers of funds as part of the close of escrow in the Gililland home sales. Additionally, a number of mailings occurred in connection with the loan application and funding process.

       G.     Use of Computers

50.     Based on interviews of employees and other sources, Gililland routinely uses email to communicate with straw buyers, mortgage brokers, and loan processors he uses in his scheme. According to these sources, Gililland uses computers at his home-office to fabricate documents concerning his straw buyers.

H.     Permeated by Fraud

51.     Based on the foregoing, I have probable cause to believe that Garret Griffith Gililland III, Anthony G. Symmes, Nicole Magpusao, Baker & Baker Construction, and others are conducting a scheme to defraud lenders in violation 18 U.S.C. §§ 1341, 1343, 1344, 1349 and 1014, and that evidence of this fraudulent scheme is likely to be found at the places to be searched. I also have probable cause to believe that G III Construction, Inc., GIG Enterprises, Inc., Norcal Innovative Investments, Inc., West Coast Training Systems, Creative Funding Consultants in Chico, and Creative Real Estate Consultants in Chico, conduct no legitimate business and that the sole purpose of these entities is to perpetrate the scheme to defraud set forth in this affidavit. Because these entities are permeated with fraud, any documents or other information related to these entities or to mortgage activity are subject to seizure.

I.     Drugs and Guns on Premises

52.     In February 2008, one confidential source reported seeing a ziplock freezer-bag of marijuana located in Gililland's garage at 824 Whispering Winds Lane. Another source reported that before he began his mortgage fraud scheme, Gililland had made money selling marijuana. Other sources report Gililland himself is a user of marijuana and illegal steroids. Reliable sources report that Gililland keeps a number of firearms at his residence.

## IV.  ITEMS TO BE SEIZED

53.     SA Roberts has participated in the execution of search warrants both in narcotics cases and white collar cases. Permission is sought to search and seize the evidence related to (1) the conspiracy to cultivate and distribute marijuana, (2) the mortgage fraud scheme, as well as (3) evidence of money laundering.

54.     With respect to the conspiracy to cultivate and distribute marijuana, the following items, which, based on the training and experience of SA Roberts, and expertise related to him by narcotics enforcement officers, are relevant items that may be seized:

a.     Marijuana plants, marijuana in all stages of processing, and marijuana seeds.

b.     Paraphernalia used to consume marijuana, including pipes, cigarette papers, bongs, alligator clips, and other smoking devices.

c.   Literature related to the manufacture, distribution and/or consumption of marijuana, including books, magazines, articles, and notes.

d.   Materials used in the packaging of marijuana for distribution, including cigarette papers, hot bag sealers, plastic bags, and jars.

e.   Weighing devices, such as scales (excluding bathroom scales), suitable for weighing quantities of marijuana.

f.   Large amounts (over $1000.00) of United States currency.

g.   Records and ledgers of drug transactions documenting scales of marijuana, including computer records; buyers lists; sellers lists; papers bearing notations of whole or fractional ounce, pound, or kilogram quantities; papers bearing notation of numbers of money consistent with drug dealing.

h.   Articles of personal property to establish the identity or identities of the person(s) occupying or controlling the property or vehicles searched and where evidence may be seized, including, without limitation, bills, personal telephone books, personal phone books, address books, papers and documents containing list of names, utility company receipts, correspondence, keys, exposed but undeveloped film, videotapes, personal DVD's, and photographs.

i.   Devices used to communicate with other drug traffickers and customers, including without limitation, telephone answering machines, cellular telephones, beepers, walkie-talkies, and Blackberry-type devices.

j.   Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras, night vision optical equipment, and monitors, anti-bugging devices or transmitters, and/or receipts or literature describing the same.

k.   Guns, ammunition, magazine clips, silencers, spare parts for guns, and dangerous weapons used to protect the drug manufacturer or trafficker. Receipts, manuals, literature, documents, and boxes or packaging materials related to the items in this paragraph.

l.   Supplies, equipment, and tools associated with the manufacture of marijuana, including grow lights, pumps, containers for growing marijuana plants, ballasts, aerators, light shades, plastic sheeting, hydroponic grow media, water lines,

electrical meters, light tracking devices, pots, trays, fans, carbon dioxide generators, reflective film, humidifiers, potting soil, fertilizer, timers, irrigation equipment and devices, feedbags, backpacks, pouches, burlap bags, nylon & plastic bags, plastic storage containers ground processing devices, herbicides, pesticides, insecticides, drying screens, drying lines, gloves (gardening, work, rubber, or plastic), and checks and receipts for the purchase of such items.

m.     Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, and cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds money.

n.     Photographs, negatives, video tapes, films, and photographic slides depicting co-conspirators, assets and/or controlled substances. This search warrant authorizes the initial seizure of exposed but undeveloped film, to allow law enforcement to determine the contents therein, and whether the developed film and photographs are seizeable by this search warrant.

o.     Address and /or telephone books, Rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists and where drug proceeds may have been invested.

p.     All electronic storage devices capable of storing data regarding the records listed above, including but not limited to, hard drives, thumb drives, CDs, DVDs, magnetic tapes and disks (floppy and hard), and the computer hardware necessary to retrieve the electronic data, including but not limited to, the central processing unit (CPU), viewing screen (Monitor, CRT), disk or tape drives (magnetic and/or optical), keyboards, printer, software and manuals for the operation of the computer, together with the instruction manuals. Information on hard disks may be copied and authenticated with the appropriate chains of custody.

    55.     From training and experience, SA Roberts knows that persons engaged in financial crimes, including mortgage fraud schemes and money laundering, frequently retain

records of their financial activities in various places under their control including their residence, place of business, rented storage units, or vehicles. Records of this kind are also often stored on computer media. Such records include the following, all of which may be seized:

    a.    Customer files and lists related to the services or product provided.

    b.    Records and/or documents memorializing the sale/distribution of their product or the providing of services.

    c.    Records and/or documents provided to customers in connection with the services or product.

    d.    Correspondence to and/or from actual or prospective customers.

    e.    Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business.

    f.    Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services.

    g.    Personnel and payroll/commission records for all employees that appear to be engaged in the business.

    h.    Business or personal records related to the receipt, transfer and expenditure of income received from the business.

    i.    Bank records, credit card account records, brokerage account records, investment records, financial institution records and other records reflecting the receipt of income, transfer of assets or expenditure of income produced by the business.

    j.    Records relating to the purchase or sale of real estate including loan files, title company records, mortgage applications, correspondence, escrow records and instructions, and invoices for work or credits claimed.

    k.    Documents relating to straw buyers and other clients for whom they falsify documents.

    l.    Documents or materials that evidence newspaper, internet or other advertizing or solicitation of tenants to rent residential properties.

    m.    Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, directives, organizational charts.

56.     Persons engaged in financial crimes, including fraud schemes, often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.   There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance, but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert.

## V. COMPUTER DATA

57.     Based upon my knowledge, training and experience, and my consultation with other criminal investigators including fellow FBI agents with specialized training related to computers, I know that computer files or remnants of such files (including e-mails) can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

58.     Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading

filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence requested to be seized.

## VI. COMPUTER SEARCH PROCEDURE

59.     In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.     Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.     If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

c.     In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and

determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

      d.     If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 90 days from the date of seizure unless further authorization is obtained from the Court.

      60.    In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

      a.     Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses;

      b.     Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

      c.     Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

      d.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

      e.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

      f.     Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

      g.     Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## VIII.   CONCLUSION

61.     Based on the above information, there is probable cause to believe that Garret *Km* *Baker Construction* Griffith Gililland III,  Nicole Magpusao, Anthony Garth Symmes, Baker & ~~Construction~~, and others, have operated a mortgage fraud scheme in violation of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Bank and Wire Fraud), and 1014 (False Statements of a Loan Application).  Further, I believe that Gililland has also conspired to manufacture more than 100 marijuana plants, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  I also have probable *Baker Km* cause to believe that Gililland, Magpusao, Symmes, and Baker & Construction have conducted financial transactions with the proceeds of unlawful activity in violation of Title 18, United States Code, Sections 1957 (Money Laundering).

62.     Based upon the foregoing, this Affiant respectfully requests that this Court issue a search warrant for the residence, all outbuildings and vehicles located at 824 Whispering Winds Lane, Chico, California, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, both of which are attached hereto and incorporated by reference as if set forth in full.

63.     It is further respectfully requested that this Court issue an Order sealing, until an indictment is publicly-filed or absent further order of this Court, all papers submitted in support of this Application, including the Applications, Affidavit, and Search Warrants, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the subject premises).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.  In particular, it could alert Gililland and his co-conspirators to the existence of the investigation and imperil the government's ability to seize relevant evidence.

64.     I swear, under penalty of perjury, that the foregoing information is true and correct, to the best of my knowledge, information and belief.

Kathleen A. Nicolls
Special Agent, Federal Bureau of Investigation

Subscribed and sworn before me this 2 4th day of June, 2008

Hon. Kimberly J. Mueller
United States Magistrate Judge

Approved as to form:

Russell L. Carlberg
Assistant United States Attorney

Attachment A

824 Whispering Winds Lane, Chico, California, 95928 is a beige
one story house with a red tile roof on a corner lot.  It has
two pillars at the front entryway, and a semi-circular driveway
in front of the house.  The garage is on the far right side of
the house when looking at the front door.  The residence has an
outbuilding with a driveway in front of it and a swimming pool
behind it.  The number 824 is clearly marked on the mailbox in
front of the house and on the house itself. The search includes
the   residence,   garages,   all   outbuildings,   curtilage,   and
vehicles located on the premises.



Attachment A





## ATTACHMENT B
## ITEMS TO BE SEIZED
### Mortgage Fraud and Money Laundering

Any and all documents pertaining to Garrett Griffith Gililland III, Nicole Magpusao, Anthony G.
Symmes, William Baker, Larry Biegler, G III Construction, Inc., GIG Enterprises, Inc., Norcal
Innovative Investments, Inc., Cosmo Loans Financial, Creative Funding Solutions, Creative Real
Estate Consultants, Streamline Transactions, Inc., 3rd Sky Mortgage, 3rd Sky Escrow, Mariposa
Traditions, Inc., Ceanothus Traditions, Inc., Rockin M, Inc., Agasy, Inc., Floral Arrangement,
Inc., and Baker & Baker Construction, including:

1. Articles of personal property tending to establish the identity of persons in control of the
premises searched, including but not limited to utility bills and receipts, rent receipts, mail
envelopes, identification and/or travel documents, vehicle registration and ownership
information, and other items which establish personal identification.

2. Invoices, statements, receipts, contracts, agreements, Western Union and other financial wire
transfer service receipts, credit card receipts, money order receipts, records/receipts reflecting
payments made by and on behalf of, or received from customers and business associates,
records/receipts reflecting electronic funds transfers between said entities or persons or between
said entities or persons and any customer, and records/receipts tending to reflect payments made
by or refunds made to customers and business associates or the expenditure of funds received
from customers or business associates.

3. Address books, files and records evidencing the identity of customers, clients and associates;
business correspondence, facsimile records, correspondence to/from overnight courier services,
accounting ledgers and journals; work papers, customer lists, personnel records, pay records, and
customer complaints against the company, and other associated companies and individuals.

4. Bank, financial institution, and investment account records, check books, statements, deposit
slips, canceled checks, customer checks, cashier's checks, cash in excess of $1,000, loan records,
financial statements, credit reports, records of wire transfer, treasurer's checks, keys to safe-
deposit boxes, and tax returns and return information.

5. Records of corporations or business trade names used by Garret Griffith Gililland III, Nicole
Magpusao, Anthony G. Symmes, William Baker, and Larry Biegler.

6. Any and all documents and materials relating to the purchase or sale of real estate including loan files, title company records, mortgage applications, correspondence, escrow records and instructions, and invoices for work or credits claimed.

7. Any and all documents relating to suspected straw buyers, including:

Phillip Andreas; Roman Aquino; Hugh Arca;  Earl Armor; Erica Arnett; Kelly Blake; Christopher Brown; Christopher Chiavola; Katie Chiavola; Eric Clawson; Juana Contreras; Michael Frank Dematteis, II; Maria Devilla; Christopher Faulkner; Crystal Fortune; Edward Fortune, Jr.;  Alfaro Alberto Garcia;  James M. Goularte; Thaddeus Brandon Greene; Jake Halvig; Enoch Hernandez;  Lucia Hernandez; Loren C. Jacques; James Lambert; Samuel Marquez; Pedro Pinto; Brandon Resendez; James Saraniecki; Allan Lawrence Sarti; Sharrah Rueanna Trust; and Aaron Sherwood.

8. Any documents, records or materials that evidence newspaper, internet or other advertizing or solicitation of tenants to rent residential properties.

9. Shipping documents/receipts to or from Federal Express, Airborne Express, United Parcel Service, the United States Postal Service, and opened and unopened United States Mail and/or items shipped by other courier services.

10. Any documents related to civil actions and claims and any recordings of telephone conversations, employee conversations, and answering machine tapes pertaining or related to the business operations of  Garrett Griffith Gililland III, Nicole Magpusao, G III Construction, Inc., GIG Enterprises, Inc., Norcal Innovative Investments, Inc., Creative Funding Solutions, Creative Real Estate Consultants.

11. Documents, programs, applications or materials created, modified or stored in any form, including electronic or computerized data.

12. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

    a.     Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.  If such material may be safely searched within a

reasonable period of time, then the law enforcement personnel with computer expertise who are conducting the searches are directed to do so.

b.   If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

c.   In searching the data, the computer personnel may screen the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

d.   If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant, the government will return these items within a reasonable period of time not to exceed 90 days from the date of seizure unless further authorization is obtained from the Court.

13.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a.   Any computer equipment and storage device capable of being used to commit, further or store evidence of Mail Fraud and Wire Fraud, in violation of Title 18 U.S.C. Sections 1341 and 1343;

b.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, thumb drives, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory

calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

<u>Conspiracy to Manufacture More than 100 Marijuana Plants:</u>

14.  Marijuana plants, marijuana in all stages of processing, and marijuana seeds.

15.  Paraphernalia used to consume marijuana, including pipes, cigarette papers, bongs, alligator clips, and other smoking devices.

16.  Literature related to the manufacture, distribution and/or consumption of marijuana, including books, magazines, articles, and notes.

17.  Materials used in the packaging of marijuana for distribution, including cigarette papers, hot bag sealers, plastic bags, and jars.

18.  Weighing devices, such as scales (excluding bathroom scales), suitable for weighing quantities of marijuana.

19.  Large amounts (over $1000.00) of United States currency.

20.  Records and ledgers of drug transactions documenting scales of marijuana, including computer records; buyers lists; sellers lists; papers bearing notations of whole or fractional ounce, pound, or kilogram quantities; papers bearing notation of numbers of money consistent with drug dealing.

21.  Articles of personal property to establish the identity or identities of the person(s) occupying or controlling the property or vehicles searched and where evidence may be seized, including, without limitation, bills, personal telephone books, personal phone

books, address books, papers and documents containing list of names, utility company receipts, correspondence, keys, exposed but undeveloped film, videotapes, personal DVD's, and photographs.

22.    Devices used to communicate with other drug traffickers and customers, including without limitation, telephone answering machines, cellular telephones, beepers, walkie-talkies, and Blackberry-type devices.

23.    Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras, night vision optical equipment, and monitors, anti-bugging devices or transmitters, and/or receipts or literature describing the same.

24.    Guns, ammunition, magazine clips, silencers, spare parts for guns, and dangerous weapons used to protect the drug manufacturer or trafficker. Receipts, manuals, literature, documents, and boxes or packaging materials related to the items in this paragraph.

25.    Supplies, equipment, and tools associated with the manufacture of marijuana, including grow lights, pumps, containers for growing marijuana plants, ballasts, aerators, light shades, plastic sheeting, hydroponic grow media, water lines, electrical meters, light tracking devices, pots, trays, fans, carbon dioxide generators, reflective film, humidifiers, potting soil, fertilizer, timers, irrigation equipment and devices, feedbags, backpacks, pouches, burlap bags, nylon & plastic bags, plastic storage containers ground processing devices, herbicides, pesticides, insecticides, drying screens, drying lines, gloves (gardening, work, rubber, or plastic), and checks and receipts for the purchase of such items.

26.    Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, and cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds money.

27.    Photographs, negatives, video tapes, films, and photographic slides depicting co-conspirators, assets and/or controlled substances. This search warrant authorizes the initial seizure of exposed but undeveloped film, to allow law enforcement to determine

the contents therein, and whether the developed film and photographs are seizeable by this search warrant.

28.   Address and /or telephone books, Rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists and where drug proceeds may have been invested.

29.   All electronic storage devices capable of storing data regarding the records listed in paragraphs 11-26, above, including but not limited to, hard drives, thumb drives, CDs, DVDs, magnetic tapes and disks (floppy and hard), and the computer hardware necessary to retrieve the electronic data, including but not limited to, the central processing unit (CPU), viewing screen (Monitor, CRT), disk or tape drives (magnetic and/or optical), keyboards, printer, software and manuals for the operation of the computer, together with the instruction manuals.  Information on hard disks may be copied and authenticated with the appropriate chains of custody.

    a.   The procedures describes in paragraphs 12 and 13, and their subparts, also apply to paragraph 29.